STANTON v. COX.

(Division A. Jan. 25, 1932.)

[139 So. 458. No. 29458.]

Geo. H. Stanton, of Great Falls, Mont., and J. L. Taylor, of Gulfport, for appellant.

440

Mize, Mize & Thompson, of Gulfport, for appellee.

Argued orally by **Geo. H. Stanton**, and **J. L. Taylor**, for appellant, and by **S. C. Mize**, for appellee.

**McGowen, J.**, delivered the opinion of the court.

Mrs. Rita Cox exhibited her declaration against Mrs. Dorothy Stanton, seeking to recover damages of the latter for the wrongful, malicious, and oppressive alienation of her (Mrs. Rita Cox) husband's affections, charging that Mrs. Stanton had thus destroyed all the love, devotion, and affection which Mrs. Cox's husband, I. H. Cox, had for her (the said Mrs. Rita Cox), and by the aforesaid acts broke up the home of appellee and her husband.

The declaration set forth, in great detail, the circumstance of the alleged alienation of affection.

This case is unique in several particulars. The two women involved, Rita Cox and Dorothy Stanton, were the wives of lawyers, one of them practicing in Oklahoma, and the other in Montana; and although Mrs. Stanton has since married one Campbell, she is represented in this case by her former husband, Stanton, from the state of Montana.

The record in the case is rather volumnious, but the facts essential to be stated for an understanding of the case are substantially as follows: About the year 1909, I. H. Cox, the spouse of appellee, and Dorothy Porter, later Stanton, and still later Campbell, were engaged to be married. Mrs. Stanton broke the engagement with Cox and married Stanton, and in a short time Cox married the appellee, Rita Cox.

As a result of the union between the Stantons there were born three children; and to Cox and wife there was born one son.

According to the record here on appeal, there was no communication between Cox and Mrs. Stanton, save a casual meeting at her father's house in Chicago in 1917, until November, 1924, when Cox, being on a professional visit to Memphis, went from that place to Pass Christian, Mississippi, where Mrs. Stanton was living, and spent a day or two there, being constantly in company with Mrs. Stanton. Mrs. Stanton had removed from Montana to Pass Christian, Mississippi, in 1922; and although she had not been divorced from her husband, the record discloses that Stanton and his wife contemplated such act. After this visit, in 1924, on the part of Cox to the home of Mrs. Stanton, there sprang up between them a lively, amorous correspondence, there being in evidence a number of letters written by Mrs. Stanton to the husband of Mrs. Cox, the appellee.

In February, 1926, Cox, being ill with the "flu," dropped a letter from his pocket from Mrs. Stanton to him, which the appellee, Mrs. Cox, read, and thereupon she procured his office keys, went to his office, and found stored there about two hundred letters from the appellant (Dorothy Stanton) to Cox, the husband of appellee, which revealed to her the love affair in lively progress. She took from her husband's office forty or fifty of Mrs. Stanton's letters to Cox, and thereupon he admitted his fondness for Mrs. Stanton, and announced to his wife that he desired her to get a divorce from him. While such discussion was in progress, Mrs. Rita Cox was called to a distant state on account of the illness of her son, then in school; and when she returned Cox had evidently repented and sought a reconciliation, to which she readily assented, one of the conditions of the reconciliation being that she turn over to him the letters from Mrs. Stanton. In the meantime, Mrs. Cox had carried the letters to the office of a relative, who was a lawyer, for safekeeping, who had phostostatic copies made of the letters, and Mrs.

Cox also had a stenographer make typewritten copies of certain letters from Mrs. Stanton, which she identified and swore to as being correct copies. When Mrs. Cox delivered the letters to her husband, he burned them in her presence.

During the Christmas holidays in 1924, Cox brought home with the Christmas mail a picture of Mrs. Stanton, which Mrs. Cox admired, remarking that Mrs. Stanton was a handsome woman; she did not suspect, at that time, the relations between Mrs. Stanton and I. H. Cox. Mrs. Cox testified that their married life, until just before the discovery of the letters, had been happy and pleasant; that her husband had provided her with an automobile, spent money on trips, and their home was a very happy one; but that just before the discovery of the letters she had observed that his attention to and affection for her had waned to a marked degree. After the reconciliation in 1926, the marital relations were for a while resumed, and were as pleasant as before the disagreement, until she became convinced that Cox was still in correspondence with Mrs. Stanton; and during his absence she found in her husband's office letters, telegrams, and a bill for roses sent by him to Mrs. Stanton from a florist in New Orleans.

Including the visit in 1924, the record shows that Cox, who lived in Okmulgee, Oklahoma, visited Mrs. Stanton four or five times at her home in Pass Christian, Mississippi, for a day or two at a time. A number of letters were introduced, which we shall not set forth at length, but only extracts to show their tenor. Mrs. Stanton usually addressed Cox as "Darling," and in most of the letters expressed her love for him, and the letters were usually signed "Affectionately, Dorothy." This correspondence began immediately after Cox's visit to Pass Christian in November, 1924, and continued until about February, 1928. In an undated letter she used this language: "I trust none of my effusions are in the hands of

some quite disinterested bystander—or even worse, in interested hands—you might be ruined." In this letter she spoke of a garment which a woman wears close to her body, in connection with the killing of her pet cat, and concluded with these words: "Oh my darling, please, please know I love you always and am simply existing until I can be in reality. Your Dorothy."

In another letter she admonished him that whatever they did must be done calmly and judiciously, no matter how difficult, saying, "But we both know what we hope and pray to accomplish—having a definite goal is a help. Some day I trust I can pour out all my thoughts and we can be really without barriers—it's certainly the closest approach to divine communion one could hope for on this earth."

On July 27, 1925, she expressed a desire to see him on the following Saturday, insisting on his visit in several letters. On August 27, 1925, after his visit to her, she wrote expressing her delight and desire for another trip soon. And in more than one letter she referred to the fact that they were both planning to be divorced, and her pleasure at the consummation of their desire.

In March, 1926, she said in a letter to Cox: "You must be seeking a loophole of escape;" assuring him of her mother's resignation in the matter, and concluded with, "You will have to find another loophole—that is all I have to say." She complained because he talked about money, and said they could not wait until they were a hundred and ten years old, saying; "I can do without lots and want to, but you keep on talking, putting it off until I cannot look on you as anything but a lukewarm lover. . . . Gosh, I wish you'd get vehement just once so I could put it in my 'line a day book'—I haven't any—don't be worried." She spoke of his living in the same house with Rita, and said she (Dorothy Stanton) could not feel nice and happy while loved like that. In another letter she said, "We must work things out to-

gether." In still another letter she said that their loyalty was going to different persons than the ones to whom it was legally due. She was anxious for the judge's decision, and in another letter she was anxious to be just the way he wanted her to be. The last letter in point, dated February 4, 1928, beginning "Hugh, dear," and closing, "Affectionately, Dorothy," in which she said "we must not lose each other" was written after she knew of the reconciliation. between Cox and his wife. In February, 1928, she wrote Cox: "No one knows how I regret and grieve over your unhappy state of mind, and I know so well what is the right and noble thing to do. It is not fair to make Rita unhappy, nor Dan."

This letter was written by Mrs. Stanton about two years after Cox had advised her that he and his wife had effected a reconciliation.

The effect of Mrs. Cox's testimony was that until the visit to Mrs. Stanton, and until this correspondence began, her husband, I. H. Cox, had been a kind, affectionate husband. She admitted that on one or two occasions, when drinking, he had struck her, but on account of his condition she had ignored this.

Mrs. Stanton's testimony is to the effect that I. H. Cox came to her home, and reminded her of their former engagement, and asked her to write to him, requesting her to consider becoming engaged again and getting married, telling her that he was unhappy with Rita, and that he expected to be divorced as soon as their son had graduated, the son at that time being past sixteen years of age. Mrs. Stanton said that Cox's letters to her were as amorous as hers, and as frequent; and that, when she learned of the reconciliation, she respected that agreement; but admitted that she wrote him the letter dated February 4, 1928. She also admitted that when he visited her he kissed her.

Mrs. Stanton testified that she made no attempt to dampen Cox's ardor, but rather encouraged it, inducing

him in every way possible to continue and increase it; and that they became engaged while he was still living with his wife, and before she was divorced from her husband.

The record shows that when Mrs. Cox discovered this letter of February 4th, the bill for flowers, etc., she notified Cox, upon his return, that she was going to be divorced, and declined to live with him. Accordingly, she sued for a divorce, and the decree was granted in February or March, 1929, about which time Mrs. Stanton, who had theretofore been divorced from Stanton, married Campbell. Mrs. Cox testified that the earning capacity of Cox was twenty thousand dollars or twenty-five thousand dollars a year.

There were two trials of this case in the lower courts; on the first trial there was a verdict by the jury for fifty thousand dollars, which, upon motion for a new trial, was set aside by the court, and a new trial granted. On the second trial there was a verdict for thirty thousand dollars; the court ordered a remittitur of fifteen thousand dollars on the part of plaintiff in the court below, and in accordance therewith there was a judgment for fifteen thousand dollars, from which Mrs. Stanton appeals to this court.

First. The appellant contends that she was entitled to a peremptory instruction, because the evidence was insufficient to support the verdict, and that the verdict is contrary to the evidence. The defendant in the court below and here plants her defense on the proposition that the evidence shows that Cox voluntarily withdrew his affection from his wife, and because of his visit and offer to renew the courtship and love affair with Mrs. Stanton, he was the aggressor; and that Mrs. Cox had theretofore lost the affection of her husband.

The main case relied upon by appellant is Scott v. O'Brien, 129 Ky. 1, 110 S. W. 260, 262, 16 L. R. A. (N. S.) 742, 130 Am. St. Rep. 419, in which may be found the controlling principle of law upon which this case was

tried in the court below, and which, in our judgment, is in accord with the weight of authority in this country. These principles are as follows:

" 'In order to sustain an action for the alienation of the husband's affections it must appear, in addition to the fact of alienation or the fact of the husband's infatuation for the defendant, that there had been a direct interference on the defendant's part, sufficient to satisfy the jury that the alienation was caused by the defendant, and the burden of proof is on the plaintiff to show such interference.' 15 Am. & Eng. Ency. of Law, p. 865. Again, on page 866, it is said: 'But to maintain this action it must be established that the husband was induced to abandon the wife by some active interference on the part of the defendant.' In 3 Elliott on Evidence, section 1643, it is said: 'To entitle the plaintiff to recover in an action for alienating affections, the burden of proof is upon the plaintiff, and the plaintiff must show that there was a direct interference upon the part of the defendant that not only was there infatuation of the husband or wife for the defendant, but that the defendant by wrongful act was the cause of it.' "

In the case at bar the offending husband did not testify. The evidence upon which the appellant bases her hope for a peremptory instruction is Mrs. Stanton's testimony to the effect that Cox came to her home and made her a proposition to consider resuming their former relation, and to maintain a correspondence with him.

In an action for alienation of affection brought by an injured spouse, there must needs be a wrongful act on the part of the other spouse with a stranger, unless it be that the offending spouse was a moron. In the case at bar the evidence was perhaps sufficient to permit this defense on the part of the appellant to go to the jury, but barely so. On the other hand, her frank admission that she encouraged Cox to assume the relation of a lover

to her, inducing him in every way possible to carry on that relation, even becoming engaged to him, although she knew that Cox was living with his wife, and not divorced from her, was a wrongful act on her part, which is emphasized by the fact that after Cox notified her that he had effected a reconciliation with his wife, and Mrs. Stanton had consented to abide by that reconciliation she thereafter wrote him, in 1928: "We must not lose each other." This tends to show a willful and active interference with the injured wife's right to the consortium or conjugal society, which is the basis of this character of action.

If the jury believed that these letters, from which we have quoted certain striking passages, were calculated to induce a man to leave his wife, the jury might well have believed that Mrs. Stanton was a shrewd, educated woman, who tried in every way she could, by blandishments, by cajolery, by enticement, and by all the arts of a woman skilled in dealing with the object of her desire, to actively interfere with the marital rights of the complaining wife.

So long as a husband and wife are living together, strangers who interfere with their marital relations, even though the domestic relation has become strained, must know that they cannot accept propositions which lead to the dissolution of the matrimonial tie. The injured spouse has a right to use diplomacy and tact in order to win back waning affection, and affect a reconcilation, on the theory so aptly expressed in the old camp meeting hymn: "While the lamp holds out to burn, the vilest sinner may return." Waning affection may be revived, or at least there is a possibility of it, so long as the marital tie remains undissolved.

This record shows that Mrs. Cox and her husband were living happily until the year 1925, at which time she discovered that her husband's love for her was waning, and later discovered the letters being written to her husband

by this stranger to the marital relation. And the jury were warranted in believing that these were love letters, skillfully written, to cause a loss of affection on the part of Cox for his wife. And the jury were further warranted in believing that this was done clandestinely, for she did not want her letters to fall into either interested or disinterested hands.

Cox's proposition, so far as this record shows, seems to have been presented to Mrs. Stanton in a business way. There is no evidence of enticement on his part, or of seduction, in her statement in regard to the renewal of their relations. He left it up to Mrs. Stanton, and went back to his wife. From the letters of Mrs. Stanton, the jury might well have believed, with the Bard of Avon, that Cox entertained the view thus expressed:

"Did not the heavenly rhetoric of thine eye,
'Gainst whom the world could not hold argument,
Persuade my heart to this false perjury?
Vows for thee broke deserve not punishment.
A woman I foreswore; but I will prove,
Thou being a goddess, I foreswore not thee:
My vow was earthly, thou a heavenly love;
Thy grace being gained cures all disgrace in me.
My vow was breath, and breath a vapour is;
Then, thou fair sun, that on this earth doth shine,
Exhale this vapour vow; in thee it is:
If broken, then it is no fault of mine.
If by me broke, what fool is not so wise
To break an oath, to win a paradise?"

The jury might further believe that these letters were, in truth, a powerful factor in stimulating the mind of Cox to decide to leave his wife, and assume what appeared to him a more pleasing relation with the fair adept in the siren's art.

Mrs. Stanton actively and aggressively sought to hold him when he struggled to withdraw from the unholy al-

liance, by taxing him with coldness and lack of vehemence, sending her picture at an opportune time, and playing on all the strings which would tend to persuade the man to forsake his wife. She did this with knowledge of all the facts. She sympathized with 'poor Rita,' while she wrote that she prayed for the day when they (she and Cox) would realize their heart's desire; and finally wrote him, "We must not lose each other."

In 13 R. C. L., page 1464, section 513, we find this applicable statement: "While a stranger may, without liability, harbor a wife who has left her husband, he may not persuade him to leave her, or not to return to him; for although she may not have just grounds for a separation, yet she may choose to return, and a stranger has no right to intermeddle, and if he does so voluntarily he must answer for the consequences." Under this state of facts, the appellant was not entitled to a directed verdict.

It is assigned for error that the court permitted the introduction of a kodak picture of the appellant, upon which, in Cox's handwriting, were the words, "Received 10-3-27;" there was no objection to the kodak picture, and therefore we cannot consider this assignment of error.

Second. It is contended that the court erred in permitting a diary of Cox, the husband, to be admitted in evidence. This diary was found by Mrs. Cox at the time she found the photograph and letters from Mrs. Stanton in Cox's office. About the only thing established by the diary was the fact of the visits to Mrs. Stanton by Cox, admitted by her on the witness stand; therefore, there was no reversible error in this behalf.

Third. It is contended that the court erred in admitting the typewritten copies of the letters by Mrs. Stanton to Cox. There is no question but that the copies were proved to be correct copies of the originals; there

is no question but that Mrs. Cox delivered the originals, which she had abstracted from her husband's private desk, back to her husband, and that he destroyed the same. The letters belonged to Cox, the husband, and the wife had no right to retain them; nor did she have any right to raise her voice in protest against his doing what he pleased with his property. The appellee did not destroy the letters; she merely restored property wrongfully in her possession to its rightful owner, in delivering the letters to Cox. She had neither the right to object nor consent to her husband's destroying the letters which she delivered to him in order to effect a reconciliation of their marital differences. Of course, we recognize that these letters were secondary evidence, and the original or first evidence had been destroyed.

In Jones' Comm. on Evidence (2 Ed.), page 1502, section 819, we find this statement, which is unquestionably correct: "The rule of law which requires the best evidence within the power or control of the parties to be introduced should not be relaxed," and the court held that they had not been willfully destroyed nor voluntarily withheld. Mr. Wigmore, in his work on Evidence, upheld practically this statement of the rule. Mrs. Cox delivered these letters to their rightful owner; she did not voluntarily destroy or withhold them in an effort to prevent the truth of the matter from coming to light. She gave the letters back to her husband for the purpose of satisfying him of her honest desire to retain and maintain the conjugal relation. There was no fraud on her part, if it be said that she was not a party to the destruction of the letters. The object of the rule is to prevent fraud, and to prevent a party from willfully withholding the best evidence, and substituting the secondary or inferior evidence in its place.

From Jones on Evidence, vol. 2, page 1511, we find that the true rule is that the destruction must be inten-

tional, and for fraudulent purposes, and for the purpose of producing a wrong to the opposite party. And the secondary evidence is competent if the act in destroying the primary evidence is consistent with an honest purpose.

Fourth. The appellant offered in evidence her financial condition, to which the court sustained an objection. It is not competent to admit in evidence the financial condition of defendant in defense or in mitigation of damages in a suit for alienation of affection. The injured party is entitled to recover for the tort without regard to whether the wrongdoer is a millionaire or a pauper. 13 R. C. L. 147, section 528.

Fifth. Objection is made to the testimony of Mrs. Cox as to the statement made to her husband's love affairs. We think there is no merit in these objections. 30 C. J. 1139, section 1101.

If there are other objections, intended to be such, in the brief of counsel, they are without merit, and on the whole case we think that no reversible error was committed by the court.

On the cross-appeal the judgment for fifty thousand dollars should not be reinstated, because the peremptory instruction granted the plaintiff in the court below was improperly given on the first trial; we need only say that in that case Mrs. Cox answered interrogatories in accordance with the statute to the same effect as her testimony in the case at bar, and that Cox, the husband of the appellee here, there testified that Mrs. Stanton did not in any manner alienate his affections, and assigned reasons for his loss of affection for his wife. His testimony made up the controversial issue which should have been submitted to the jury, and which should not have been decided by the court. The court properly set aside that judgment, and error may not be here predicated thereon.

Affirmed on direct and cross-appeals.